**Shi Mui LIU and Tung Hoi Wong, Appellants,**

v.

**Susan Au ALLEN, Appellee.**

**No. 03–CV–263.**

District of Columbia Court of Appeals.

Argued Jan. 25, 2005.
Decided March 16, 2006.

Frederic W. Schwartz, Jr., for appellants.

Dennis J. Quinn, Washington, for appellee.

Before WASHINGTON, Chief Judge,* and SCHWELB and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

This appeal from a defense verdict in a legal malpractice action turns on whether the attorney was negligent as a matter of law. We hold not. Accordingly, the jury's decision stands.

## I.

Susan Au Allen is an attorney who practices in the field of immigration law. In 1989, Allen was engaged to obtain immigrant status for Shi Mui Liu based on the offer of a job for her as a seamstress at The Marine Shop, a military uniform store in Quantico, Virginia. Liu was living then in Hong Kong, where she was employed by the Blooming Star Manufacturing Company ("Blooming Star"). Allen proceeded to file the necessary applications. In July of 1994, after the Department of Labor had issued an alien employment certificate, the Immigration and Naturalization Service ("INS") approved an immigrant visa petition filed by The Marine Shop to classify Liu as an unskilled prospective immigrant worker.

A year later, on June 15, 1995, Liu came to the United States with her husband Tung Hoi Wong on a temporary visitor's visa. During her visit, Allen advised Liu that she could extend her stay and apply for an adjustment of her visitor's status to that of a legal permanent resident alien; that is, in common parlance, Allen told Liu

that "you can change from your visitor's visa to a green card." Liu decided to take advantage of the opportunity thus presented and asked Allen to apply for a green card for her and for Wong as her spouse.

Allen filed Liu's application for an adjustment of status, together with a request for interim employment authorization, in September 1995. The INS approved the employment authorization in November (enabling Liu to work at The Marine Shop during the pendency of her green card application) and scheduled Liu and Wong for an interview at the INS District Office in Baltimore. At the conclusion of that interview, which took place in March of 1996, and which Allen attended, the adjudication officer advised that Liu and Wong would be notified when the INS reached a decision on their applications. Although Allen believed that the applications were straightforward and problem-free, the adjudication officer had raised questions during the interview relating to her clients' residence and their intentions in coming to the United States.

Six months later, on October 2, 1996, the INS issued a letter denying Liu's and Wong's applications for permanent resident status on the ground that Liu had a "preconceived intent to immigrate" when she applied for her temporary visitor's visa and therefore had "misrepresented a material fact to procure that visa." The denial letter gave Liu fifteen days to show why her employment authorization, which was linked to the pendency of her application, should not be revoked.

When Allen reviewed the letter of denial, she realized that the INS had based its decision on a misreading of Liu's application. The application clearly stated that

* Chief Judge Washington was an Associate Judge of the Court at the time this case was argued. His status changed to Chief Judge on August 6, 2005.

Liu had worked for Blooming Star in Hong Kong until May of 1995 and then entered the United States on her temporary visitor's visa the following month. Inexplicably, however, the INS erroneously understood that Blooming Star was located in the United States, and therefore that Liu had left *this country* (not Hong Kong) in May 1995 in order to "return" here the following month on a temporary visa. The INS inferred that Liu executed such a maneuver "to insure that [she] would be in valid immigration status at the time of filing [her] application for permanent residence to circumvent from [*sic*] having to pay the large penalty fee for being out of status." This mistaken reasoning led the INS to conclude that Liu improperly had "entered the United States as a visitor with the intent to immigrate."

Allen promptly sent a lengthy letter to the INS on October 16, 1996, pointing out the INS's evident factual errors and asking it to reverse its decision. In mid-November, she received a standard form response, which suggested that she file a motion for reconsideration as outlined in Title 8 of the Code of Federal Regulations. Allen was given the same advice when she spoke with the INS Baltimore District Counsel about the matter a week later. By this point, the time for filing a formal motion for reconsideration of the October 2 denial had expired, because 8 C.F.R. § 103.5(a)(1)(i) (1996) required such a motion to be filed "within 30 days of the decision that the motion seeks to reconsider." The motion also had to be accompanied by a non-refundable $110.00 filing fee.

8 C.F.R. §§ 103.5(a)(1)(iii)(C); 103.7. Recognizing these requirements, Allen wrote the INS on December 2, 1996, to request that her October 16 letter be treated as a motion for reconsideration (which it in substance was), and she enclosed the filing fee.

On January 22, 1997, the INS notified Allen that her motion for reconsideration—which it treated as having been filed on December 2, not October 16—was dismissed as untimely.[1] Declining, therefore, to reexamine its denial of Liu's green card application, the INS also revoked her employment authorization.

While the INS decision was not appealable, Liu and Wong were not subject to immediate deportation, and the denial of Liu's first green card application did not preclude her from filing a second one. Allen offered to re-file the application at no charge. Having lost confidence in Allen, however, Liu retained new counsel to renew the application, which the INS ultimately granted over two years later, in May of 1999.[2]

## II.

After they finally received their green cards, Liu and Wong sued Allen in Superior Court for malpractice and breach of contract. In essence, they asserted that Allen was negligent as a matter of law in failing to comply with the INS regulation that required motions for reconsideration to be filed within thirty days. The trial court denied appellants' pretrial request

1. 8 C.F.R. § 103.5(a)(4) provided that "[a] motion that does not meet applicable requirements shall be dismissed."

2. In addition to causing Liu and Wong further trouble and expense in their effort to immigrate, the initial denial and subsequent delay in granting their green card applications arguably prevented them from bringing their son with them, because he turned twenty-one years of age on October 26, 1996. Given the view we take of this case, *see infra,* we do not reach appellants' contention that the trial court erred in striking their claim for damages for the emotional injury they suffered from being separated from their son.

for a *per se* negligence instruction,[3] however, and allowed the parties to present conflicting expert testimony at trial on whether Allen's failure to move for reconsideration within thirty days violated the applicable standard of care.

In the opinion of appellants' expert witness, an immigration attorney named Patricia Wohlford, the prevailing standard of care unquestionably obligates an attorney seeking to reverse the denial of a green card application to follow the procedural route for seeking reconsideration laid out by the INS in its regulations. While Wohlford agreed that other, informal approaches can be pursued as well to induce the INS to correct an obvious error of the type that occurred in Liu's case, she insisted that a reasonably competent attorney still must take care to preserve the applicant's procedural rights by moving for reconsideration, and paying the required filing fee, within the thirty-day time frame specified by 8 C.F.R. § 103.5(a).

Allen testified that she chose to send a letter rather than file a formal motion for reconsideration because she believed an informal communication would be "most effective [and] would bring the fastest result."[4] Her immigration law expert, Thomas Elliot, approved of her reasoning and opined that her choice comported fully with the applicable standard of care. Disagreeing with Wohlford, Elliot characterized the filing of a timely motion for reconsideration in accordance with INS regulations not as compulsory, but rather as merely one of several options available for seeking relief from an erroneous INS decision. According to Elliot, experience taught that Allen's informal approach is often more effective than a formal motion for reconsideration; for while the INS commonly takes a long time to decide formal motions and may be resistant to granting them,[5] INS officers are willing and able to reverse adverse decisions on their own initiative, without a formal motion, when an obvious error is brought to

3. The requested instruction would have told the jury that if Allen did not act in accordance with 8 C.F.R. § 103.5(a), "then you *must* find that she was negligent." (Emphasis added.)

4. Allen elaborated on that explanation as follows:

Because at that time I looked at it, it was such a glaring error, so obvious. That was such a bad mistake by the INS, and I would say anybody who got that would say, "Oh, gee, this is—Susan Allen, I'm sorry, you are right." They would turn around and fix it. I thought any reasonable person would have done it. And this had happened to me before in other cases, and I made phone calls, written letters and turned things around, and those thing[s] come back immediately. A motion, it goes through the formal process. They go into the file, set it up, and ... also when you do that with the Government, sometimes they look at it [as a] more threatening, more serious threatening gesture. So, you just do this informal communication. And with me it had worked before, and I took that route.

In Allen's experience, the INS could "ignore" a formal reconsideration motion for so long that it "becomes meaningless because by the time they look at it, everything is over."

5. "[T]he biggest problem with motion[s] to reconsider," Elliot testified, "is getting INS to act." Elliot elaborated on this problem as follows:

[I]t's a discretionary decision they make whether to reopen or not and then whether to approve it or not, and in Baltimore cases can take a long time. Could be a year, could even be longer. I have heard of a colleague say that he's never gotten an answer in one particular case on a motion to reopen and reconsider. These things happen. INS, for a number of reasons, it's a tough issue. They don't want to admit to their mistakes. Baltimore is a prime candidate for that. . . . There is no regulation or law that says how soon that INS must answer a motion to ... reconsider.

their attention.[6] Elliot deemed Allen's October 16 letter particularly appropriate because the INS itself invited it when it afforded Liu fifteen days to submit evidence showing why her employment authorization should not be revoked. "If they ask for something," Elliot opined, "you give them what they ask for." An attorney in Allen's position "would reasonably expect INS to correct their mistake on their own motion" in response to the letter Allen sent, Elliot stated, and Allen thus had no reason to think that a formal motion was needed even as a precautionary measure.[7]

At the close of the evidence, the case was submitted to the jury with a special verdict form that separated out the issues of negligence, proximate causation, and damages. The jury found no negligence and therefore did not reach the remaining issues.

Appellants moved for partial judgment on the issue of negligence notwithstanding the verdict and for a new trial. Rejecting their arguments that Allen was negligent as a matter of law and, alternatively, that the jury's decision was against the clear weight of the evidence, the trial judge denied relief and permitted the jury's verdict to stand.

## III.

Appellants' arguments for reversal in this court proceed from one basic premise: Allen's failure to comply with the procedural requirements for seeking reconsideration set forth in 8 C.F.R. § 103.5(a) constituted negligence[8] as a matter of law. The regulation, in other words, conclusively established the national standard of care for attorneys who intend to seek reconsideration of INS decisions. Even if other options were available, appellants argue, there was no justification for Allen to ignore the regulation entirely and not file a timely motion to ensure that her arguments for reconsideration would be addressed. From that premise, appellants argue that the trial judge erred in allowing Allen to present contrary expert testimony on the applicable standard of care,[9] and in denying

---

**6.** *See* 8 C.F.R. § 103.5(a)(5)(i) (1996) (permitting INS officers to reconsider decisions on their "own motion, ... in order to make a new decision favorable to the affected party").

**7.** On the latter point, Elliot testified as follows:
> Q. Had a reasonably competent attorney filed a motion to reconsider pursuant to the regulations, with the fee within the time frame here, do you have an opinion as to how the INS would have responded to that?
> A. If it's the Baltimore office, I have a definite opinion, yes.
> Q. What is your opinion?
> A. That given the way they have responded in this case, they would have denied any timely filed motion ... to reconsider because I go back to the formal regulation that allows INS on its own motion at any time to reopen and reconsider, and they chose not to, when there was clear error. That is a perfect situation for INS

to exercise, under the regulations, its authority to reopen and reconsider. Now if they chose not to do it there, I don't think they would do it if it [i.e., a motion] was filed by counsel. If they are not going to do it on their own, if they don't recognize their clear error and make a change, they are not going to accept it in any motion. They made it clear, in my opinion.

**8.** Although appellants sued Allen for breach of contract as well as negligence, the applicable standard of care is the same under each cause of action. *See O'Neil v. Bergan*, 452 A.2d 337, 343 (D.C.1982).

**9.** In a variation on their theme, appellants also argue that it was error for the trial judge to require them to present an expert witness to establish the standard of care in their case-in-chief, because what they call Allen's "blunder" was so "self-evident" that it could be found negligent as a matter of "common

their post-trial motion for partial judgment as a matter of law and a new trial.[10]

Appellants' arguments do not succeed because, as the trial judge also concluded, their premise is faulty. "While the general standard of conduct is an invariable legal rule—it requires an attorney to exercise that degree of reasonable care and skill expected of members of the legal profession under the same or similar circumstances, ... the specific standard of conduct required under a given set of factual circumstances is a question to be answered by the trier of fact on a case-by-case basis with the assistance of expert testimony, in most instances, adduced at trial." *Waldman v. Levine,* 544 A.2d 683, 689 (D.C.1988) (citations omitted). The existence of the INS regulation governing motions for reconsideration certainly was relevant to "the specific standard of conduct" applicable in determining whether Allen was negligent; indeed, we do not doubt that a jury *could have* found that Allen breached the applicable standard of care by failing to file a timely motion in accordance with the requirements of 8 C.F.R. § 103.5(a). But under settled legal principles in this jurisdiction, appellants' jury was not *required* so to find.

 Ordinarily, while the violation of a statute or a regulation having the force of law may be evidence of negligence, "it does not constitute negligence *per se.*" *Rong Yao Zhou v. Jennifer Mall Rest., Inc.,* 534 A.2d 1268, 1274 (D.C.1987). The exceptions to that general rule are not applicable in this case. It is true that "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute [or regulation], unexplained violation of that standard renders the defendant negligent as a matter of law." *Chadbourne v. Kappaz,* 779 A.2d 293, 295 (D.C. 2001) (internal quotation marks and citations omitted). In other words, "where a party violates a statute [or regulation], and the violation is a proximate cause of an injury which the statute [or regulation] was designed to prevent, there is a rebut-

knowledge." *See O'Neil,* 452 A.2d at 341 (adopting "the widely followed rule that, in a legal malpractice action, the plaintiff must present expert testimony establishing the standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge"). Pretermitting discussion of whether requiring appellants to call an expert was error, though we doubt it, we deem it sufficient to say that appellants sustained no prejudice from having to present Patricia Wohlford's testimony.

10. A trial court may grant a motion for judgment as a matter of law notwithstanding the verdict only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor. *Levi v. District of Columbia,* 697 A.2d 1201, 1204–05 (D.C. 1997). We apply the same standard in reviewing the denial of such a motion on ap-

peal. *Aurora Assocs. v. Bykofsky,* 750 A.2d 1242, 1246 (D.C.2000). In contrast, for a trial court to grant a motion for a new trial, it must find that "the verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand." *United Mine Workers v. Moore,* 717 A.2d 332, 337 (D.C.1998) (citation omitted). The trial court is afforded "broad latitude in passing upon a motion for new trial," and we review its decision "only for abuse of discretion." *Id.* (citation omitted). The scope of appellate review is "especially narrow" when the trial court denied the motion, as in that case "the trial court's unique opportunity to consider the evidence in the context of a living trial coalesces with the deference properly given to the jury's determination of such matters of fact as the weight of the evidence." *Oxendine v. Merrell Dow Pharms.,* 506 A.2d 1100, 1110–11 (D.C.1986) (internal quotation marks and citation omitted).

table presumption of negligence on the part of the violator." *Id.* (internal quotation marks and citations omitted). But as the trial judge determined, the restrictions contained in 8 C.F.R. § 103.5(a) were not promulgated in order to protect movants in the position of appellants, or to prevent the INS from dismissing their requests for reconsideration without reaching the merits. Rather, as the trial judge stated, "the regulation was enacted to serve INS's interest in orderly process and the finality of its decisions." And even if we were to find otherwise, and view Allen as having "violated" (i.e., failed to comply with the requirements of) an ordinance intended for the protection of appellants' rights, her violation was not "unexplained." Allen was entitled to, and did, introduce evidence rebutting the presumption of negligence, namely her and her expert's testimony that it was reasonable in the circumstances not to proceed by way of a formal motion but instead to proceed informally. Where "the defendant produces evidence tending to excuse or explain the violation, the violation may be considered evidence of negligence rather than negligence *per se.*" *Chadbourne,* 779 A.2d at 295 (citations omitted).

■ To be sure, an attorney's negligence sometimes may be so "clear," even if an explanation is attempted, that expert testimony is superfluous and the attorney even may be found negligent as a matter of law. *See, e.g., Hamilton v. Needham,* 519 A.2d 172, 175 n. 6 (D.C.1986) (addressing omission from will of residuary clause requested by testator; "[a]n attorney may be found negligent as a matter of law in a clear case such as this"). Appellants argue that in the absence of extraordinary justification, such as intervening circum-

stances beyond the attorney's control, missing a mandatory filing deadline falls within this category. *See, e.g., O'Neil,* 452 A.2d at 342 (offering, in dictum, "allowing the statute of limitations to run on the client's claim" as an example of clear malpractice to which the "common knowledge" exception to the requirement of expert testimony may apply). We have recognized that, generally speaking, an attorney "has a duty to pay attention to filing deadlines and not to let one go by in any pending case without doing whatever needs to be done." *Cameron v. Washington Metro. Area Transit Auth.,* 649 A.2d 291, 294 (D.C.1994). Immigration attorneys have been subject to professional discipline for missing filing deadlines to the potential prejudice of their alien clients. *See, e.g., In re Ryan,* 670 A.2d 375, 377 (D.C.1996).

■ The contested issue in this case, however, was not whether Allen had a duty to file a reconsideration motion by a certain deadline, but whether, in order to seek reconsideration, she had a duty to file a formal motion at all. Appellants' assertions notwithstanding, 8 C.F.R. § 103.5(a) does not settle the latter question. Invoking "the principle that the selection of one among several reasonable courses of action does not constitute malpractice," *Waldman,* 544 A.2d at 688, Allen and her expert witness plausibly testified that her informal submission constituted an equally valid, equally efficacious (if not superior) alternative to a motion for reconsideration. Even if that assessment may not have been borne out by subsequent events, the conflict between qualified and competent experts on this central point was substantial enough to preclude a determination that Allen was negligent as a matter of law.[11] The question of negligence there-

---

11. Although appellants challenge Elliot's opinion testimony as illogical and self-contradictory in various respects, we defer to the jury's assessment of his credibility and resolution of seeming inconsistencies in the expression of his opinions. For example, appellants

fore was one for the jury to decide, and its decision was not so clearly against the weight of the evidence as to call for a new trial. Although appellants (and their expert) disagree strongly with the testimony of Allen's expert, "their disagreement presents no grounds for reversal." *Id.* at 690.

*Affirmed.*

argue that Elliot failed to explain why Allen should not have taken the elementary precaution (hedged her bets, as it were) of filing a timely motion for reconsideration in addition to her October 16 letter. Based on Elliot's testimony, though, the jury could have discounted this argument on the ground that, as a practical matter, filing both a motion and the letter would not have been calculated to improve appellants' chances of securing a favorable ruling and might even have been counter-productive.